# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

Assigned on Briefs at Nashville December 1, 2015

## STATE OF TENNESSEE v. JAMES HOLMES

**Appeal from the Criminal Court for Shelby County**
**No. 13-01976    W. Mark Ward, Judge**

———————————

**No.  W2015-00537-CCA-R3-CD  -  Filed March 11, 2016**

———————————

The Defendant, James Holmes, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder, felony murder during the attempt to perpetrate a robbery, attempted especially aggravated robbery, attempted first degree murder, attempted carjacking, and employing a firearm during the attempt to commit a dangerous felony.  *See* T.C.A. §§ 39-13-202(a) (2014) (first degree murder), 39-13-202(b) (2014) (first degree felony murder), 39-13-403 (2014) (especially aggravated robbery), 39-12-101 (2014) (criminal attempt), 39-13-404 (2014) (carjacking), 39-17-1324(i)(1) (2014) (dangerous felony), 39-17-1324(b) (2014) (employing a firearm during the attempt to commit a felony).  On appeal, the Defendant contends that the evidence is insufficient to support his convictions.  We affirm the judgments of the trial court and remand for correction of the judgments.

## Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed; Remanded for Correction of Judgments

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT L. HOLLOWAY, JR., JJ. joined.

Stephen C. Bush, District Public Defender; Barry W. Kuhn (on appeal), and Lisa Kutch and Kathy Kent (at trial), Assistant Public Defenders, for the appellant, James Holmes.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Ray Lepone and Reginald Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the October 9, 2012 shooting death of Roneccia Luster at an automated teller machine (ATM) and the attempted carjacking and shooting of Charles Ratliff a few minutes later.

At the trial, Memphis Police Department (MPD) Officer Kevin Bobo testified that on October 9, 2012, around 7:00 p.m. he responded to a shots-fired call at Perkins Road and Aloha Avenue. He said that when he arrived at the scene, the Memphis Fire Department had responded to a car crash at the same intersection in front of a McDonald's restaurant and requested his assistance. Officer Bobo stated that a vehicle had crashed into a utility pole and that the pole had been knocked down.

Seven photographs were received as exhibits that depicted the scene of the crash. The photographs showed a red sedan that had collided with a metal utility pole, which had broken in half. The sedan's hood was crumpled, the windshield had shattered, and the driver's side airbag had deployed.

Katrina Foster testified that on October 9, 2012, at 7:00 p.m., she was in the Orion Federal Credit Union parking lot directly behind an ATM using her cell phone with her car windows partially open. Ms. Foster said that a woman in a burgundy or maroon four-door sedan was using the ATM and that she observed two men walking "very, very swiftly" across the parking lot toward the ATM. Ms. Foster stated that one man approached the passenger-side door and the other man approached the driver's side door. Ms. Foster heard a scream and a gunshot, and she said that the sedan "jerked" out of the parking lot into the street, moving until hitting a utility pole in front of McDonald's.

Ms. Foster testified that the two men ran toward McDonald's. She drove away from them, but she circled around and saw people coming out of McDonald's to help the driver of the sedan. Ms. Foster parked her car and waited to speak with the police. Ms. Foster stated that she had been parked behind the ATM for three minutes before the shooting. She said that her car was ten to twelve feet from the ATM, that no other cars were in the parking lot, and that the parking lot lights were off. She stated that it was dusk, but that the light was sufficient to see outside. Ms. Foster stated that the ATM had lights and that she was facing the ATM. Ms. Foster stated that the man standing at the passenger side of the sedan was close to the car but that the man standing at the driver's side was the person who shot the woman.

MPD Officer J.R. Rector testified that on October 9, 2012, he collected evidence at the scene of the shooting. Officer Rector said that he collected a .22-caliber shell casing and a white t-shirt near the ATM. He also collected a brown vest with an electronic device in its pocket in the backyard of a building across the street from the car crash.

-2-

Billy McCoy, a fraud prevention officer at Orion Federal Credit Union, testified that he was responsible for maintaining the surveillance cameras at the bank's ATMs. He said that he provided ATM surveillance footage from the time frame of the shooting to the MPD and created still photographs from the video recording.

The video recording was played for the jury. In the recording, a red sedan drove up to the ATM, and a woman wearing a United States Postal Service uniform opened her driver's door and used the keypad. After about one and one-half minutes, a man wearing a grey hooded sweatshirt approached the passenger side of the car, and another man wearing a white vest over a red shirt approached the driver. The woman closed her door, and the man on the driver's side pulled out a gun. As the car began to move, the woman moved away from the gun, putting up her left arm to shield herself, and the man pointed the gun at the woman. The gun fired as the car pulled away. The two men walked in the opposite direction of the car. The timestamp on the recording reflects that no more than one second lapsed between the time the men became visible on the screen and the time the car drove out of the frame. A photograph from the recording depicting the shooter's face was received into evidence.

Angela Marion, the Defendant's mother, testified that that on October 9, 2012, she saw a news report of a robbery at an ATM. She said she recognized the Defendant on the surveillance video. Ms. Marion stated that the Defendant called her and told her "that he had messed up," that he shot a young woman during a "robbery gone wrong," and that he did not mean for it to happen. Ms. Marion said she went to the police station the next day, gave a statement, and identified several pictures of the Defendant and his friend from the video recording.

MPD Officer D'Andre Johnson testified that on October 9, 2012, he responded to a shooting call at the male victim's workplace and that when he arrived, the victim was sitting in the building's office bleeding. He said that the victim had been shot in the arm and the leg and that the victim was coherent. He stated that the victim identified his blue Chevrolet Corvette and that Officer Johnson saw a bullet hole inside the car. Officer Johnson did not remember whether the car had exterior damage.

MPD Officer Sam Blue testified that he responded to the male victim's workplace after Officer Johnson. He took photographs of the victim's car, which showed two shell casings on the front driver's side floorboard, a McDonald's bag on the front passenger seat, and blood on the center console. Officer Blue said that the victim's car was taken to MPD for processing.

On cross-examination, Officer Blue testified that he found three shell casings on the front driver's side floorboard. He said that he also found shell casings on the front passenger-side floorboard. He stated that it was difficult to determine how many shell

casings were present by looking at the photos and that his report noted three shell casings in the car.

Arthur Lunceford, Jr. testified that on October 9, 2012, he was sitting in his work truck in a parking lot across the street from McDonald's when he saw two men "run across my truck with a gun and it jammed." Mr. Lunceford said that the two men jumped over a fence and that he saw one man hand the other man a gun. Mr. Lunceford stated he saw a woman crash a car into a utility pole immediately before the men ran in front of his truck. Mr. Lunceford said that after the men jumped over the fence, he ran to the woman's car and checked her pulse, but he could not find one. Mr. Lunceford said that he called the police and reported to them the direction in which the men traveled.

On cross-examination, Mr. Lunceford testified that he saw the men before he saw the crash and that the men were walking. He acknowledged his statement to police that one black man wore a white hooded sweatshirt and black pants and a dark-skinned man wore blue jeans and a grey hooded sweatshirt. Mr. Lunceford said that the man in the white hooded sweatshirt climbed the fence before the man in the blue jeans. He stated that the man wearing blue jeans handed the man in the white hooded sweatshirt a gun before climbing the fence.

The male victim testified that on October 9, 2012, he went to McDonald's on his work break. He said that as he pulled out of the drive-through, he saw a woman driving a car hit a utility pole. The victim stated that he noticed two men walking toward his car but that he did not think the men intended to harm him. He said that one of the men jumped on the car, put a gun against the top of the victim's head, and told the victim, "Get out of the car, b----." The victim said that he smacked the gun away and that the man started shooting. The victim said that he and the man fought, that the man got off the car and ran across the street, and that the victim tried to chase the man in his car, but that he never clearly saw the man's face. The victim stated that as he chased the man, the man shot at the car. After the man ran away, the victim said that he realized he was wounded and went to a nearby convenience store. He said that he asked the clerk for help. The victim then drove to his workplace and told his supervisor that he had been shot and to get help. The victim stated that the police arrived and that he went to the hospital. The victim said that he was shot in his left shoulder and his right arm.

On cross-examination, the male victim testified that there was a mechanic shop beside McDonald's. The victim stated that the two men walked toward McDonald's from the ATM and that the victim did not pay attention to them initially because of the car crash. He said that one of the men wore a white hooded sweatshirt but that he did not pay attention to the other man.

The male victim testified that he was in a convertible Corvette and that the top was down, allowing the man to jump into the car and put the gun to the victim's head. The

-4-

victim said that the struggle lasted about thirty seconds, that the man shot into his car five times, and that the man shot at the Corvette three additional times as he ran away. The victim stated that he believed the man in the white hooded sweatshirt was the shooter. The victim said that the man in the white hooded sweatshirt ran across Perkins Avenue and the other man ran toward the side of McDonald's.

The male victim testified that he was at the convenience store for two or three minutes, that his car horn had been shot and was "stuck on," and that he fixed it at the store. He said that he was at his workplace for five minutes before the police arrived. The victim denied having a gun or shooting at the men.

MPD Officer Sheila Wright testified that she processed the victim's Corvette and identified three shell casings, bullet fragments, and cards with fingerprints she collected from the car, which were received as exhibits. Officer Wright said that she found three shell casings on the passenger-side floorboard and fingerprints on the car's left side, right side, and rear exterior panels. She said that she found bullet fragments on the floorboard behind the driver's seat, in the right side of the driver's seat shoulder rest, and in the center console near the right side of the driver's seat. She stated that she photographed possible bullet holes inside the car, including one on the top of the center console lid, and three holes of unknown origin on the exterior passenger door behind the handle. She said that she did not collect any blood.

Robert Winston, an expert in examining latent fingerprints, testified that he worked for the MPD and that he submitted the fingerprints from three of the collected fingerprint cards for a search in the Automated Fingerprint Identification System (AFIS). The fingerprints matched records for Charles Ratliff and Bishardo Higgs, the codefendant.

MPD Officer Newton Morgan testified that he processed and took photographs of the interior of the female victim's car. The photographs showed the victim's work identification card, her wallet and checkbook, a receipt from the ATM at the time of the shooting, and a sweatshirt that was part of the victim's work uniform.

MPD Officer Stacy R. Milligan testified that he was dispatched on October 10, 2012, to photograph a gun possibly used in a crime. Officer Milligan said that he located the gun and photographed it. Officer Milligan said there were six .22-caliber bullets in it and that he had mistakenly recorded seven bullets in his report.

On cross-examination, Officer Milligan testified that the gun, a .22-caliber long rifle, was found inside a fenced backyard. Officer Milligan stated that he placed the bullets in separate envelopes on the day the gun was recovered. Officer Milligan acknowledged that his report listed one bullet in the chamber of the gun and six in the magazine but said five bullets were in the magazine. Officer Milligan stated that it was

possible he waited to remove the bullets from the gun until he arrived at the police station.

Tennessee Bureau of Investigation (TBI) Special Agent Samantha Spencer, an expert in serology and DNA analysis, testified that she compared dry and wet DNA swabs taken from the gun with saliva swabs taken from the Defendant and the codefendant. She said that swabs taken from the back of the trigger and the handle of the .22-caliber long rifle recovered by Officer Milligan were consistent with the Defendant's DNA. Agent Spencer said that the Defendant's DNA was present on the wet swab taken from the gun. On cross-examination, Agent Spencer testified that the probability of another person matching the DNA profile from the swabs was one in 322 African-Americans.

TBI Special Agent Cervinia Braswell, an expert in firearms identification analysis and comparison, testified that she analyzed the gun recovered by Officer Milligan and determined that the recovered shell casings had markings matching the test bullets, indicating that they were fired from the same gun. She stated that the bullet taken from the female victim's body had some identifying markings consistent with being fired from the gun recovered by Officer Milligan but that there were not enough markings to conclude with certainty that it came from the gun. Agent Braswell stated that a semiautomatic gun chambered a new bullet automatically when fired. Agent Braswell said the gun's magazine held ten rounds, plus one in the chamber, for a total of eleven. She said she received four cartridge casings, one bullet, two lead fragments, one plastic fragment, and six live rounds.

Paul Foster testified that he worked in a mechanic shop on Perkins Avenue and that on October 9, 2012, he was bringing cars into the shop when he saw a young woman drive her car to the ATM. He entered the shop, and when he returned outside, he heard a gunshot. Mr. Foster stated that he saw two men but that he did not see the men's faces. Mr. Foster saw the car turn and drive at a high rate of speed until it hit a utility pole.

Mr. Foster testified that he started walking toward the car to help the woman and that he saw the two men shooting at a Corvette. He stated that one man jumped in and out of the Corvette and that the Corvette chased the man through the parking lot. Mr. Foster said that the other man ran past the car crash site. Mr. Foster stated that when he got to the woman's car, he saw that the force of the collision had pushed the car's motor onto the woman's legs and that he was unable to remove the woman from the car.

On cross-examination, Mr. Foster testified that the mechanic shop was beside McDonald's. He said that the two men who approached the Corvette were the same men he saw near the ATM, that he thought one of the men wore a white t-shirt, and that he did not see their faces. Mr. Foster stated that he heard the gunshot when he was inside the

shop. Mr. Foster said that the Corvette was located in the turn lane on Perkins Avenue. He thought the driver of the Corvette fired shots but never got out of the car.

Mr. Foster testified that he told the police that the driver of the Corvette fired six or seven shots, that he thought the driver got out of the car and fired at the men twice, and that both men who approached the Corvette were armed. Mr. Foster said that the man in the white t-shirt jumped in the Corvette and that the other man stood in front of the Corvette on the driver's side. Mr. Foster stated that the man outside the Corvette was shooting and that the man who had jumped inside wrestled with the driver for control of a gun. Mr. Foster said the Corvette chased the man standing outside the car.

The codefendant, Bishardo Higgs, testified that he and the Defendant had been friends since high school and that they often spent time together. He said that on October 9, 2012, he and the Defendant walked to Ten Mile Creek apartment complex in order to smoke marijuana and to spend time with women. The codefendant stated that the Defendant wanted to walk to McDonald's and that when they arrived, the Defendant smiled and said, "Look." The codefendant stated that he thought the Defendant had seen someone they knew because he was smiling. The codefendant said the Defendant walked toward a car.

The codefendant testified that when they were closer to the car, the Defendant said, "Watch this," pulled out a gun, ran to the car, and told the driver to get out. The codefendant said that the woman pushed the gas pedal and the Defendant shot her. The codefendant stated that he did not remember walking away with the Defendant because he was shocked and that he and the Defendant watched the car as it drove away. The codefendant said that the Defendant repeatedly stated, "I shot the seat" and that the Defendant appeared more shocked than the codefendant. The codefendant identified himself and the Defendant in the ATM surveillance recording. The codefendant identified the vest recovered by police as the Defendant's and said the Defendant wore it during the shooting.

The codefendant testified that he thought the Defendant panicked and that when another car pulled up, the Defendant jumped on the car. The codefendant stated that he climbed on the back of the car in order to "snatch" the Defendant off the car and that the Defendant got off the car and told the driver to get out. The codefendant saw the Defendant and the driver wrestle to gain control over a gun and the codefendant heard gunshots. The codefendant said later, though, that he was focused on the car crash when he heard gunshots. He said that when he looked over, the Defendant was on top of the car holding a gun to the driver's head.

The codefendant testified that he ran, climbed on the back of the Corvette, and grabbed the driver's jacket. The codefendant stated that the driver rapidly accelerated and hit the brakes in the middle of the street, at which point the codefendant and the

Defendant fell off the Corvette and ran away.  The codefendant said the Defendant told him that the driver shot himself.

The codefendant testified that as he fled, he climbed a fence and saw the Defendant throw the gun over the fence before he followed the codefendant.  The codefendant said the Defendant fell, and the codefendant continued running.  The codefendant denied being armed or shooting anyone and said he did not know the Defendant was armed.  The codefendant said he and the Defendant saw one another in jail.  The codefendant said the Defendant told him that the Defendant would "take his charge" and tell the police the codefendant was not involved.  The codefendant said that he did not know the Defendant was going to pull out a gun at the ATM or what the codefendant would have done if the Defendant had successfully gained control of the Corvette.

The codefendant testified that he did not go to the police after the shooting because he believed the Defendant was going to tell the police that the codefendant was not involved and that it "wasn't on me" to report the Defendant to the police.  He said he was testifying because two years had passed and the Defendant had not taken responsibility.  The codefendant said that he did not have an agreement with the State but acknowledged that he hoped to receive consideration after his testimony.

On cross-examination, the codefendant testified that during his initial police interview, he lied when he denied having any knowledge of the crime.  The codefendant stated that he had been charged with murder in perpetration of a robbery, attempted especially aggravated robbery, attempted carjacking, and employing a firearm during the commission of an attempted carjacking.  The codefendant said that he wore a gray hooded sweatshirt and black sweatpants the night of the shooting.  The codefendant clarified that he and the Defendant did not enter McDonald's and that they changed direction to walk toward the ATM.  The codefendant stated that he never left the sidewalk and did not approach the car at the ATM.

The codefendant testified that he saw the female victim's car crash, saw the Defendant jump on the Corvette, saw the Defendant and the driver fight, and heard gunshots.  The codefendant said that he did not see the Corvette's driver with a gun and that the driver did not chase him or the Defendant across a parking lot.  The codefendant acknowledged that he had a previous theft conviction.

Dr. Miguel Laboy, an expert in forensic pathology, testified that he performed the female victim's autopsy and found a close-range gunshot wound to the victim's left forearm, a fracture to her humerus, and a gunshot wound to the left side of her chest.  He stated that the heart and liver were perforated, an adrenal gland was lacerated, and blood accumulated in the left side of the chest, abdomen, and pericardial sac.  He said that he recovered a bullet from the abdomen and that the arm and chest wounds were consistent

-8-

with the path of one bullet. The victim had abrasions and lacerations to her head, face, right upper arm, and lower extremities, which were consistent with a car crash.

Dr. Laboy testified that the gunpowder residue on the female victim's shirt indicated that the gun was fired at close range. He said that gunshot wounds to the torso or heart would generally allow for momentary movement before a victim became unresponsive. Dr. Laboy concluded that the cause of death was a gunshot wound to the torso and that the manner of death was homicide.

Upon this evidence, the Defendant was convicted of first degree premeditated murder, felony murder during the attempt to perpetrate a robbery, attempted especially aggravated robbery, attempted first degree murder, attempted carjacking, and employing a firearm during the attempt to commit a dangerous felony.

After a sentencing hearing, the trial court merged the felony murder conviction with the first degree murder conviction and sentenced the Defendant to life imprisonment. Relative to the attempted especially aggravated robbery conviction, the court sentenced the Defendant to twelve years. Relative to the attempted first degree murder conviction, the court sentenced the Defendant to twenty-five years. Relative to the attempted carjacking conviction, the court sentenced the Defendant to six years. Relative to the employing a firearm during an attempt to commit a carjacking conviction, the court sentenced the Defendant to six years and by operation of law ordered consecutive service with the carjacking conviction. The court ordered partial consecutive sentencing. The court stated that the total effective sentence was life plus twenty-five years. This appeal followed.

## I. Sufficiency of the Evidence

The Defendant contends the evidence is insufficient to support his convictions. The State responds that the evidence is sufficient.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## A.    First Degree Premeditated Murder

Relative to the female victim, the Defendant contends that the evidence is insufficient to establish premeditation relative to Count 1, first degree murder. The State responds that premeditation was sufficiently proven. We agree with the State.

Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201, 39-13-202(a)(1). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); see *State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008).

The record reflects that the Defendant said, "Look," and "Watch this," walked up to the female victim's car with a loaded gun as she was using the ATM, and pointed the gun at the victim. The Defendant demanded she exit her car and shot her at point-blank range without hesitation when she did not comply and attempted to drive away. The Defendant walked away from the ATM and did not attempt to render aid to the victim. The evidence was sufficient for the jury to find beyond a reasonable doubt that the

Defendant acted with premeditation when he shot the victim, and he is not entitled to relief on this basis.

### B.      Felony Murder During an Attempt to Perpetrate a Robbery

Relative to the female victim, the Defendant was also convicted of felony murder during the attempt to perpetrate a robbery, an alternative theory of criminal liability for first degree murder. *See Carter v. State*, 958 S.W.2d 620, 624-25 (Tenn. 1997); T.C.A. § 39-13-202(a)(2), (b) (2014).  The Defendant argues that the intent to commit a robbery was not proven beyond a reasonable doubt.  The State responds that intent to rob the female victim was sufficiently proven.  We agree with the State.

First degree felony murder is, in relevant part, the "killing of another committed in the perpetration of or attempt to perpetrate . . . robbery[.]"  T.C.A. § 39-13-202(a)(2).  "No culpable mental state is required for conviction . . . except the intent to commit the enumerated offenses or acts[.]"  T.C.A. § 39-13-202(b).

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."  T.C.A. §§ 39-13-401 (2014).  A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2).

The shooting occurred at an ATM, a primary purpose of which is to dispense money.  The evidence reflects that the Defendant told the codefendant "Look" and "Watch this" before approaching the female victim's car, pointing a gun at her, and demanding that she exit her car.  The surveillance recording reflects that the Defendant pointed a gun at the victim and shot her as she attempted to drive away.  The Defendant later called his mother and told her that he had "messed up" by shooting a young woman during an unsuccessful robbery.  The evidence is sufficient for the jury to infer that the Defendant intended to commit a robbery, either of money dispensed from the ATM or of the victim's car.  The Defendant is not entitled to relief on this basis.

### C.      Attempted Especially Aggravated Robbery

The Defendant was convicted of attempted especially aggravated robbery of the female victim.  The Defendant argues that the intent to commit a robbery was not proven beyond a reasonable doubt.  The State responds that intent to rob the female victim was sufficiently proven.  We agree with the State.

Especially aggravated robbery is robbery, defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear,"

when the robbery is "[a]ccomplished with a deadly weapon" and where "the victim suffers serious bodily injury." T.C.A. §§ 39-13-401 (robbery), 39-13-403 (especially aggravated robbery).

As discussed above, the shooting occurred at an ATM, the Defendant told the codefendant "Look" and "Watch this" before approaching the female victim's car, pointing a gun at her, and demanding that she exit her car. The surveillance recording reflects that the Defendant pointed a gun at the victim and shot her as she attempted to drive away. The victim died from her injuries. The Defendant later called his mother and told her that he had "messed up" by shooting a young woman during an unsuccessful robbery. The evidence is sufficient for the jury to infer that the Defendant intended to commit a theft, either of money dispensed from the ATM or of the victim's car, by violence, using a deadly weapon, and that the victims suffered serious bodily injury. The Defendant is not entitled to relief on this basis.

### D.     Attempted First Degree Murder

The Defendant argues relative to the attempted first degree murder conviction that the evidence is insufficient to prove intent to kill the victim. The State responds that the evidence is sufficient. We agree with the State.

The evidence reflects that the Defendant held a gun to the male victim's head and told him, "Get out of the car, b----." When the victim pushed away the gun, the Defendant immediately began shooting and the victim was shot in the left shoulder and right arm. The victim stated that when he attempted to chase the Defendant with his car, the Defendant continued shooting at him.

The evidence is sufficient for the jury to find that the Defendant intended to kill the male victim when he fired the gun. The Defendant placed a loaded gun to the victim's head and demanded he exit his car. When the victim did not comply, the Defendant began shooting. The jury could have reasonably inferred that the Defendant intended to kill the victim when the Defendant fired the gun. The Defendant is not entitled to relief on this basis.

### E.     Attempted Carjacking and Employing a Firearm During an Attempted Carjacking

The Defendant argues relative to the attempted carjacking conviction that the evidence is insufficient to prove the Defendant intended to take the male victim's car. He also argues that as a result, the evidence is insufficient to prove the underlying felony necessary for the conviction for employing a firearm during the commission of a carjacking. The State responds that the evidence is sufficient. We agree with the State.

-12-

Carjacking is defined as "the intentional or knowing taking of a motor vehicle from the possession of another by use of: (1) A deadly weapon; or (2) Force or intimidation." T.C.A. § 39-13-404. It is a crime "to employ a firearm during the [c]ommission of a dangerous felony[.]" *Id.* § 39-17-1324(b)(1). The dangerous felonies delineated by our statutes at the time of the shooting included, in relevant part, attempt to commit carjacking. *Id.* § (i)(1)(A)-(M).

The record reflects that the Defendant jumped into the male victim's open convertible Corvette, held a gun to the victim's head, and told him to get out of the car. In addition, the record reflects that the Defendant shot the female victim moments before and she crashed into a utility pole, which attracted attention from a number of witnesses and passersby. The police and the fire department arrived on the scene a short time later. The evidence is sufficient for the jury to have inferred that the Defendant's intent was to take the male victim's car and flee the scene. The Defendant is not entitled to relief on this basis.

## II. Sentencing

Although the Defendant has not raised a sentencing issue on appeal, our review of the record relative to the Defendant's effective sentence has revealed discrepancies between the trial court's ruling as expressed in the sentencing hearing transcript and the judgment forms. Generally, when there is a conflict between the judgment of conviction and the transcript of the proceedings, the transcript controls. *State v. Crowe*, 168 S.W.3d 731, 735 n.1 (Tenn. 2005); *State v. Moore*, 814 S.W.2d 381, 383 (Tenn. Crim. App. 1991).

In the present case, the sentencing hearing transcript reflects that the trial court initially stated, "[It] should be on paper a life sentence plus twenty-five, plus six." After discussing Count 6 with the parties, the court modified the sentence and agreed with the prosecutor that the resulting effective sentence was "life plus twenty-five." The judgments do not reflect either of these effective sentences and are open to multiple interpretations.

In particular, we note discrepancies between the judgments for Counts 3 and 4 and Counts 5 and 6. The judgment for Count 3 reflects consecutive service with Count 4, but the judgment for Count 4 reflects concurrent service with Count 3. Likewise, the judgment for Count 5 states concurrent service with Count 6, but the judgment for Count 6 reflects consecutive service with Count 5. Finally, the judgments for Counts 1, 2, 3, and 4 reflect concurrent service with Count 6. Although the trial court modified Count 6 to be served consecutively only to Count 5, the court did not state whether Count 6 would be served concurrently with the remaining counts. As a result, we remand for the trial court to clarify the effective sentence to be served in confinement and to identify which counts are to be served consecutively resulting in the effective sentence. Likewise, the

-13-

court should impose the remaining counts concurrently with the life sentence.

In addition, the judgments reflect that the sentence for Count 4 is twenty-five years at 85% service, pursuant to Tennessee Code Annotated section 40-35-501(k)(5) (2014) (mandating minimum 85% service for attempted first degree murder convictions where the victim suffers serious bodily injury). Code section 40-35-501(k)(5) became effective on July 1, 2013, which was after the date of offense on October 9, 2012. Relative to Counts 3 and 5, the Defendant was sentenced as a Range I, standard offender, but the judgments do not indicate a minimum percentage of service. Therefore, we remand for correction of the judgments in Counts 3, 4, and 5 to reflect minimum 30% service.

In consideration of the foregoing and the record as a whole, we affirm the convictions, and we remand the case to the trial court with instructions to clarify its sentencing determinations and to enter corrected judgments which accurately reflect the sentences imposed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE